## THE CHICKIE.

## THE ADMIRAL.

### No. 84.

District Court, W. D. Pennsylvania.
Jan. 30, 1942.

See, also, 39 F.Supp. 200; 54 F.Supp. 21; 54 F.Supp. 19.

David M. Harrison, Roger Knox, and H. E. McCamey, all of Pittsburgh, Pa., for petitioners.

John H. Sorg, of Pittsburgh, Pa., for respondent.

SCHOONMAKER, District Judge.

This is an action in rem brought by libelant against the Steamboat "Chickie," and against the American Barge Line Company, Inc., in personam, seeking to recover damages alleged to have resulted from a collision between the barge "Admiral," owned by the River Sand Company, at a point on the Ohio River near Follansbee, West Virginia, on February 2, 1939. We heard the case on the question of liability. From the pleadings and the proof, we find on the question of liability the following facts:

The respondent American Barge Line Company, Inc., a shipper of goods and merchandise by river, owns barges in which such goods and merchandise is transported; and on February 1, 1939, had under charter the Steamboat "Chickie" owned and operated by the Lyons River Transportation Company. On that day the respondent delivered written instructions ordering the "Chickie" to pick up eleven barges and proceed down the Ohio River to meet the Steamboat "Hider," to exchange tows with the "Hider" and return to Pittsburgh with the exchanged tow. While carrying out these instructions, one of the barges in the tow of the "Chickie" struck a pier of the Steubenville Highway bridge across the Ohio River, causing the tow to break loose and scatter over the river.

After the fleet had been rescued and moored to the shore near Follansbee, Mr. George S. Bassett, general agent of the American Barge Line, Inc., went to the fleet on the evening of February 1, examining the cargoes and the condition of the barges. After conferring with Captain Schlegel as to how the fleet of barges was tied up to the shore, he told him to check the lines over in the morning, and if everything was found to be all right, to deliver one empty barge to Yorkville, and then to go downstream with the "Chickie" until she met the "Hider," to help the "Hider" upstream with her tow to the point where the "Chickie" had left her tow moored to the shore, and there exchange tows with her. Accordingly on the morning of February 2, leaving the fleet of barges with nobody in charge, the "Chickie" went downstream to meet the Steamboat "Hider," which was under bare-boat charter to the American Barge Line, Inc., in command of Captain

Berkley Wright, a full-time employee of the American Barge Line, Inc. While the "Chickie" was pushing the "Hider" upstream, Captain Wright, his first mate and one or two of the crew went aboard the "Chickie." Some rigging, consisting of ratchets, wires, lashings, and a line were transferred from the "Hider" to the "Chickie" upon orders of Captain Wright, for use in tying the barges together when the "Hider" came to take over the barges to be towed by the "Hider." About six miles below the moored barges, the "Chickie" left the "Hider." Then, the "Chickie," with the Captain of the "Hider" aboard her, went to the barges and the "Hider" went on upstream. Considering the spot where the barges were moored was not a proper place to take over the tow, Captain Wright told Captain Schlegel to take the barges down to a place called "Coal Tipple," which was downstream below the location of the anchored Admiral. He selected certain barges to go first and ordered them taken down on the first trip. They were from the middle of the fleet. In working the four barges out of the fleet for the first trip down to the Coal Tipple, the mate and one or two of the deck-hands from the "Hider" assisted. Captain Wright and his men went aboard the "Chickie" and the barges, assisting in moving them about and lashing them together. While they were on the trip down to Coal Tipple with these four barges, the remaining barges broke loose and floated down the river. One of them struck the dredge "Admiral" and caused the damage the libelant is complaining about in this case. Captain Wright was a full-time employee of the American Barge Line Company and the Steamboat "Hider" was under bare-boat charter to that company. The Steamboat "Chickie" was under charter to the American Barge Line Co., Inc., with her full crew.

During the time these barges were moored on the shore of the river in Follansbee, the river was falling. When Captain Wright and the "Chickie" arrived at the point where the barges were moored, Captain Lyons, one of the owners of the "Chickie," was on the shore, and said to Captain Wright that "this tree (referring to the tree to which the barges were moored) looks like it was going to pull loose;" and in spite of that, the "Chickie" was ordered by Captain Wright to go away with the four barges of the fleet, when he had information the tree was giving way. In our view, there is no doubt that Captain Wright assumed command of the operation to get these barges to a safer location, in order that he might take them as his tow going down the river as directed.

█ On these facts, we are of the opinion that both Captain Wright and Captain Schlegel were negligent in permitting the Steamboat "Chickie" to leave the moored vessels with no one in charge to loosen the mooring lines or to do something to prevent the barges from getting away. The libelant is entirely without fault; and we can draw no other conclusion from the evidence than that if these barges had been properly moored, or a man left in charge of them to lengthen the mooring lines on account of the lowering of the water in the river, the accident would not have occurred.

█ This presents a case of collision with an anchored vessel, where the owner or person in control of the offending boat is required to explain; and if he does not, he is liable. See Cranberry Creek Coal Co. v. Red Star Towing & Transportation Co., 2 Cir., 33 F.2d 272.

The courts have held that in the case of a loaded barge tied to a bulkhead with the bottom on black river mud, when the bargee did not change his lines with the changing of the tide, and the barge overturned, the bargee was negligent in his tending or failure to tend the lines with the changing tide. See Castleton, 2 Cir., 64 F.2d 11.

It was also held in The Reichert Line, 2 Cir., 64 F.2d 13, that libels alleging that scows went aground while in the tow of a tug, made out a prima facie case which placed the burden upon the tug to show that the grounding and consequent damage were not due to her fault. Where the tug failed to prove the defense that the grounding was due to the sudden change in weather, the libelants were entitled to decrees.

Again, in the case of The Clarence P. Howland, 2 Cir., 16 F.2d 25, the court held that a collision of a tow with a pier, due to the tug's failure to check headway, made out a prima facie case and required an explanation by the tug to rebut the presumption of negligence.

On the whole case, therefore, we conclude that both respondents were negligent, and that a master should be appointed to assess the damages.

Findings of fact and conclusions of law, and decree in accordance herewith may be submitted.